Argued and submitted November 19, 2007, affirmed February 20, 2008

In the Matter of M. A. L.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

R. N. L.,
aka R. L.,
*Appellant.*

Lane County Circuit Court
03349J

Petition Number 03349J02

A136084

180 P3d 704

189-a

Ann Y. Lechman-Su argued the cause for appellant. On the brief were Inge D. Wells, and Wells & Wells.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Rosenblum, Presiding Judge, and Sercombe, Judge, and Carson, Senior Judge.

ROSENBLUM, P. J.

### ROSENBLUM, P. J.

Mother appeals the termination of her parental rights to her child, M.[1] M is now six years old and has spent more than half of her young life in foster care. She was first placed in foster care at age 19 months after mother expressed thoughts of murdering M and then killing herself. M was returned to mother over a year later, even though the case worker was concerned about mother's limited ability to cope. Approximately 9 months after M was returned, and despite mother receiving strong support from her church community and DHS, mother relinquished custody of M to DHS, and DHS sought termination of mother's parental rights. After a trial, the juvenile court ordered that mother's rights to M be terminated on the ground of unfitness. We review *de novo*, giving weight to the credibility findings of the juvenile court. ORS 419A.200(6)(b); *State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 27, 2 P3d 405, *adh'd to on recons*, 169 Or App 606, 10 P3d 332 (2000). We conclude that there is clear and convincing evidence that mother is unfit and that reintegration of M into her home is improbable within a reasonable time given mother's and M's psychological needs. We further conclude that termination of mother's parental rights is in M's best interests. Accordingly, we affirm.

Mother, 24 years old at the time of trial, had a difficult and unstable childhood marked by neglect, physical and sexual abuse, institutionalization, and suicide attempts. When mother was 16, she ran away to escape the abuse and became a ward of the court. After a series of sexually and emotionally abusive placements, mother was institutionalized, where she began cutting herself and attempted suicide multiple times. Psychological testing during her institutionalization revealed a differential diagnosis that included depression, post-traumatic stress disorder, borderline personality disorder, and multiple personality disorder.[2]

---

[1] Father, an untreated, convicted sex offender, also had his parental rights terminated. He is not a party to this appeal.

[2] Mother later reported that she was diagnosed with multiple personality disorder because she "would fake having flashbacks or being somebody else."

Shortly after her eighteenth birthday, mother was released from an institution and moved back in with her mother, who soon kicked her out. Mother then met a man over the Internet who gave her a place to stay in exchange for sex, and she became pregnant with M. During her pregnancy, mother was depressed and homeless. She eventually moved back in with her mother and gave birth to M in October 2001.

In December 2002, when M was a little over a year old, mother moved to Oregon to live with and care for her great-grandmother. According to mother's cousin Gwendolyn Cooks, mother's great-grandmother was "a little set in her ways and used to being alone" and did not want mother to "child-proof the home by moving things around." Mother and M soon moved out and stayed in a series of homeless shelters and with Cooks. Cooks testified that mother left her home after one month because Cooks had agreed to house her and M only for that period of time and, in retrospect, she wishes she had supported mother more. The record does not conclusively reveal where mother went after leaving Cooks's home, but it does reveal that mother and M stayed in several different homeless shelters and with a woman named Carol Steffans, whom she considered her "spiritual mother," before M was removed during the summer of 2003.

In early 2003, mother sought public assistance and participated in a related self-sufficiency program that included employment assistance, high school classes, and a mental health assessment by Whitney Ziemak. Ziemak saw mother several times over six months. She testified that mother openly disclosed a history of extensive childhood trauma and "was reaching out for support for herself—for her emotions and for her parenting abilities." Mother told Ziemak that her depression was "interfering in her ability to maintain her [s]elf-[s]ufficiency case plan[,] which was approximately 30 hours of job search and classes." She also expressed "that it was difficult for her to know how to parent [M] because she had never had that role model when she was growing up." Mother "was open to working with a parent support agency" to learn parenting skills. As part of the self-sufficiency program, Ziemak referred mother for a psychological evaluation. In February 2003, psychologist Pamela Joffe

evaluated mother and concluded that she was moderately depressed and experiencing anxiety about finding employment and housing.[3] Joffe and Ziemak both recommended that mother seek counseling.

After being prodded by Ziemak to make an appointment at Options Counseling, mother saw licensed clinical social worker Juveen Buckner for an intake assessment in March 2003. Mother told Buckner that she "would like to begin dealing with her past," "to learn how to be a positive parent to her child," and "to develop a positive support system." Buckner diagnosed mother with depression and possibly post-traumatic stress disorder.[4] Mother then began working with therapist Fransiska Bischof of Options Counseling. Bischof, who treated mother over the course of seven months, diagnosed her with depression and post-traumatic stress disorder and, on Axis II, a personality disorder not otherwise specified (NOS) with borderline and dependent features.[5]

Lisa Mills, an employment specialist with the self-sufficiency program, testified that mother's participation in the program was "average." She was concerned, however, about mother's lack of understanding of M's developmental needs. In February 2003, mother reported that M, who had

---

[3] Joffe deferred making an Axis II diagnosis because the psychological evaluation was designed only to assess what services mother might need to become self-sufficient. Axis II is used for diagnosing personality disorders and mental retardation and for noting prominent maladaptive personality features that do not meet the threshold for a personality disorder. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 28 (4th ed 2002) (*DSM-IV*). Axis II disorders are more resistant to treatment than Axis I disorders because Axis II disorders generally involve a more enduring and pervasive set of maladaptive behaviors, perceptions, and beliefs.

[4] Buckner also deferred making an Axis II diagnosis.

[5] "Because of the diversity of clinical presentations, it is impossible for the diagnostic nomenclature to cover every possible situation. For this reason, each diagnostic class has at least one Not Otherwise Specified (NOS) category." *DSM-IV* at 4. An NOS diagnosis may be appropriate (1) if the presentation conforms to the general guidelines for a mental disorder in the diagnostic class but the symptomatic picture does not meet the criteria for any of the specific disorders, (2) if the presentation conforms to a symptom pattern that causes clinically significant distress or impairment but has not been included in the *DSM-IV* classification, (3) if there is uncertainty about etiology (*i.e.*, whether the disorder results from a general medical condition, is substance induced, or is primary), or (4) if there is insufficient opportunity for complete data collection or inconsistent or contradictory information but there is enough information to place the diagnosis within a particular diagnostic class. *Id.*

been suffering from chronic ear infections, "was really pissing her off" by being "fussy" and not "want[ing] to sit still." Mills explained to mother that M's ears were probably bothering her, and that M, who was less than 18 months old, lacked the cognitive ability to intentionally misbehave. Mother replied "that [M] was being a spoiled brat and [ ] knows that she can't run around when [mother was] using the phone at the shelter." Daycare provider Karen Dirks was also concerned about mother's ability to parent M after she noticed that, although M acted like a normal child and was well-groomed, mother "was more interested in [herself] than her child" and paid little attention to M when dropping her off for the day.

Mother did, however, exhibit some progress in learning to parent. She told Ziemak that she "learned from other parents while living in [the] shelter that she should not be hitting her child." Mother reported to Ziemak that "[s]he tries not to hit [M] now but admits she is easily frustrated and angered and doesn't know how to make the child listen." Both Mills and Ziemak recommended that mother take parenting classes or seek assistance from parenting relief agencies. Mother contacted two parenting programs, but she did not enroll in classes.

In addition to her lack of understanding of M's developmental needs, Mother also struggled to provide M with proper medical care. Mother brought M to Dr. Dennis Diaz in February 2003 for treatment of M's recurrent ear infections, and Diaz recommended surgically implanting tubes in M's ears, which would require post-surgical care every four months. M received the surgery, and, although Diaz testified that he told mother to bring M back every four months, mother failed to follow through with those instructions.[6]

Also in February 2003, an unknown source reported to DHS that mother was leaving M alone in the bathtub. The next month, DHS caseworker Chad Tucker visited mother at

---

[6] By the time M returned to Diaz in 2007, she was living with a foster parent and had developed polyp point growths around the tubes as a consequence of having not received proper follow-up care. Surgery was required to remove the tubes and growths and to repair the resulting hole in M's eardrum. Although M's ears are now healthy, Diaz testified that permanent hearing loss was a potential consequence of the lack of care she received after the tubes were implanted.

the shelter where they were living to investigate. Tucker noted that M "looked healthy and well cared for" and that the shelter "was clean and appropriate." Mother told Tucker that she was involved in services, including the self-sufficiency program, and that she was seeing a counselor at Options Counseling. That same month, an employee at a parenting support agency visited mother and reported to Ziemak that where she was living looked safe.

The next month, an unknown source reported to DHS that M might not be receiving proper medical care for her ears. Tucker called M's pediatrician, who reported that "he thought that [M] was a very healthy young girl and that he was seeing her on a regular basis." He also reported that her ears looked healthy at that time.[7] Tucker ultimately concluded that the referral was unfounded and had no further contact with mother.

In May 2003, M was referred to an early-childhood intervention program. Valerie Close, the co-director of that program, visited mother at the shelter on the last day of her stay.[8] Close concluded that it would not have been a good time to evaluate M because mother was distraught, and she asked that mother contact her to set up another appointment. Mother never contacted Close to set up an evaluation,[9] but Close called DHS with concerns about M's safety after seeing mother treat M "roughly."

On June 6, 2003, mother reported to Ziemak that her depression was worsening and inhibiting her ability to look for housing or employment. At that time, mother and M were living in another shelter. Mother told Ziemak that she thought of suicide daily, and that she thought about killing M and then herself because she did not have anyone to care for M. Mother also told Ziemak that "she does not feel she knows how to love, was never taught, so [she] feels [M] is just a responsibility and does not love her." Ziemak called DHS and reported that mother was experiencing suicidal ideation and

---

[7] The tubes had been in M's ears for only one month; according to Diaz, post-surgical care would not have been necessary for another three months.

[8] The record does not reveal why mother moved from that shelter.

[9] M was evaluated after being removed from mother's care and her development was found to be within normal limits.

struggling with parenting, housing, and other stability issues.

Three days after Ziemak's report, DHS removed M from mother's care and filed a petition on M's behalf alleging that mother subjected M to threat of harm as a result of an emotional or mental condition. DHS agreed to refer mother to the relief nursery, to refer mother for a psychological evaluation, and to provide mother with a bus pass and supervised visitations. Mother agreed to attend Lane Community College, to continue counseling, and to work with her mentors to improve her parenting skills.

After M was removed, mother began working with DHS caseworker Laura Castleton, who referred mother for parenting training, assisted mother in moving into an apartment, and referred mother to a family resource worker. She also referred mother for a second psychological evaluation by Joffe.

In July 2003, Joffe saw mother to assess what services mother might need. Joffe administered psychological testing to determine whether mother was depressed, and mother scored within the minimal range of depression. A month earlier, however, mother had reported to Ziemak that her depression was worsening, and Joffe noted that her score was inconsistent with her current life circumstances, possibly as a result of defensiveness. Nevertheless, Joffe opined that if mother participated in therapy and parenting training, she may be able to successfully parent M.[10]

Although mother told Joffe that she "[didn't] like counseling, period" and particularly with a non-Christian counselor like Bischof, mother followed through with her agreement to continue counseling by seeing Susan Cummings. Cummings, who did not testify and whose records were not produced at the termination trial, told Castelton that mother had made good progress and was compliant with her appointments.

Castleton referred mother to parenting training with Gretchen Dubie in June 2003. Dubie testified that

---

[10] Joffe again deferred making an Axis II diagnosis during this evaluation.

mother "tended to be very directive of her daughter's play, often interrupting her," and "was very rigid around rules of [M's] play, * * * [s]ometimes based on her own need." Mother also "had difficulty managing [M's] behaviors when [M] was upset * * * or challenging her directives," and on at least one occasion Dubie saw mother speaking to M "in a harsh tone of voice" and "whisk[ing] her up very abruptly and forcefully * * * telling her to stop [crying]." When the parenting trainer working with mother on that day suggested that mother not touch M when she is angry, mother "acted incredulous and asked, 'So you just want me to let her stand there and cry?'" Mother also once told an interventionist that she "used to hate, I mean, *hate* my daughter * * * I would leave her alone in the bathtub and other stuff 'cause I didn't care." Mother told Dubie she was depressed and expressed "a lot of animosity" toward DHS, making it difficult for her to have a positive attitude. Dubie also noted, however, that mother and M "were very attached" and had many good interactions.

Between September 2003 and December 2003, Dubie and others worked with mother to help her play with M, to notice and respond to M's cues, and to manage her frustrations when dealing with M. Mother asked a lot of questions, was very open, and successfully completed all of her assignments. Over time, Dubie "saw small amounts of progress with [mother]" learning to respond to M's cues and play uninterrupted, but she "had more concerns regarding her sporadic temperament and presentation each week." Although Dubie discussed with mother the need to have a formal safety plan in place to deal with her depression, mother "didn't see the need" for it "because God took away [her] depression." Mother dismissed the parent trainers' concerns because "people at her church know [what to do about M] and could help" her.

While in foster care, M exhibited several disturbing behaviors, including violent outbursts involving her foster siblings, smearing her feces, hoarding food, and excessively clinging to her foster mother. Because some of those behaviors appeared to be triggered by M's visits with mother, M was referred to therapist Jayne Smith for counseling. Smith

diagnosed M with an adjustment disorder with mixed disturbances of emotions and conduct and reactive attachment disorder. As Smith worked with M and her foster parent, the behaviors improved, but Smith noted that M would often regress after visits with mother.

During this period, mother's visits with M were supervised by Libby Forsberg. Forsberg testified that, for the most part, mother was very aware of M's needs, picked up on her cues, and appropriately comforted M. Forsberg also noted that mother and M were affectionate with one another. By spring 2004, after nearly one year in foster care, M was staying up to three nights a week with mother and DHS was planning to return M to her care. Mother worked with Smith to effect the transition of M back into her home, and Smith noted that she "appeared open to suggestions [and] somewhat anxious about 'doing the right things.' " After a few sessions with Smith, mother reported that she no longer needed her support, and Smith recommended to Castelton that M's case be closed.

In July 2004, although Castelton still had concerns about mother's "limited ability to cope," she determined that mother had made sufficient progress to return M to her care. Caseworker Richard Holmes began working with mother and M. At that time, members of mother's church were helping mother by providing mentoring, transportation, budgeting, babysitting, and emotional support. Holmes helped mother secure clothing and other household items, and he reported to his supervisor that mother was making progress.

Although Holmes saw progress, members of mother's support network had different perceptions of her ability to parent M. Jill Purcell, who served as M's foster parent from June 2004 to July 2004 and who continued to support mother after M's return, testified that, although she was hopeful that mother could learn to parent M, her hope did not last. Mother had difficulty learning appropriate responses to M's behavior and exhibited questionable judgment. Purcell noted that mother shut M in her room for long periods of time and threatened to leave her unattended in the apartment; when Purcell confronted mother about it, mother responded that Purcell "c[ould]n't catch [her]" doing it. Mother would

sometimes "yell at [M] and she would yank her with her arm." Although mother "tried really hard not to * * * use her hands" to discipline M, Purcell thought that mother's behavior scared the child. Purcell also noted that mother's depression inhibited her parenting, and that M "learned how to stay in her room" because mother would "sometimes not want to get out of bed." Mother also expressed suicidal thoughts to Purcell; mother told her that she "would take care of her and her daughter" because mother did not want anyone else to raise M.

Mother began to have difficulty at the church she attended with Purcell. According to Deborah Lange, who befriended mother in October 2004, mother told her that, while acting as a youth group leader, mother had engaged in what Lange described as "some very inappropriate conversations with the kids that were young and underage[,] * * * asking them if they ever wanted to try lesbianism, if they ever had dreams or thoughts of wanting to be with a woman." Mother admitted to Lange that she "had thoughts and dreams" of "be[ing] with" the children in the youth group, and that she had similar thoughts about M.

When mother began to have difficulty with Purcell and Purcell's church, she began to rely heavily on Lange and April Mmari, Lange's friend from church, whom mother met in January 2005. Lange attempted to help mother but, just as mother had exhausted Purcell, mother "was just overwhelming right from the beginning." She inundated Lange with "constant" telephone calls and e-mails that Lange described as "harassing," and she became "obsessed" with Lange and her husband. Mother called Lange with questions such as "how [mother] could * * * stop hitting [M]," and telling Lange "that she hated [M] and [M] made her sick,"

Lange soon became concerned for M's welfare, not only because mother had disclosed that she had had either sexual thoughts or sexual dreams about M, but because mother "was one to admit at the beginning she did not know * * * how to be a mom." M "was in trouble for the littlest things and her punishments were so harsh at times," including starving M all day and locking M in her room for over

12 hours.[11] Lange testified that, on one occasion when mother refused to feed M, Lange went inside mother's home to make food for the child. The next day, mother called Lange to say that she had beaten M to punish the child because Lange had fed her. Lange, president of the church choir to which mother belonged, also observed M "getting in trouble a lot, getting snatched by the arm, pulled into the bathroom and whipped a lot" at choir practice, which occurred about once a week. Mother's moods were also unstable and bizarre, including locking herself in a bathroom at Lange's home for two hours, threatening to kill herself while M sat outside and pleaded with her to come out. Mother also once locked herself in a bathroom stall at church, started foaming at the mouth, and began hitting herself against the wall because "something was coming inside of her" until Lange and others intervened. Mother told Lange she saw spirits in her home and things flying off the walls and that Satan was communicating through her printer.

Lange was also concerned about mother's romantic relationships.[12] Although Lange tried to discourage mother from becoming involved with an ex-convict named Aaron because she "didn't want [mother] to fall prey to him," mother began a sexual relationship. Lange ignored mother's behavior until mother disclosed that she and Aaron had purchased pornography and "did all these sexual acts." Lange then asked mother where M had been, and mother only laughed, which Lange took to mean that mother had exposed M to pornography and sexual conduct. Lange also questioned mother's judgment about finances. Mother told her that she used M to panhandle; mother also made what Lange believed to be poor financial choices, including buying extravagant gifts with her student loan funds.[13]

---

[11] Mother contended in a letter admitted as a trial exhibit that she could not have locked M in her room because her internal apartment doors did not lock. M's therapist later explained that, whether or not the door actually locked, M's "perception of events is what shapes her feelings and memories, and that it was her belief that she was locked in her room."

[12] Purcell was also concerned about mother's romantic relationships, and she testified that mother told her that mother had "underage" boyfriends.

[13] At the time of trial, mother's MySpace page contained a plea for people to send her money to "help me get caught up on my rent." Mother explained that the

Mmari was similarly troubled by mother's apparent inability to care for M. Mmari also acted as a mentor to mother, helping her "any way [she] could." At times, Mmari noticed that M would come to church not having eaten and "looking really dirty and not well taken care of in my opinion."[14] Mother would feed M something from the corner store near the church because, as she told Mmari, she was "too busy to get something." Mother also told Mmari that she locked M in her room for long periods and that M "makes me sick." In fact, Mmari once called the police after mother told her that "if [she] didn't come get [M], [mother] would do something to her—to her and [M]," which both Mmari and Lange understood as another threat to mother's and M's lives. Although the police visited mother's home, M was not removed from mother's care at that time.[15]

Other people who observed mother with M during late 2004 and early 2005 saw no problems with her parenting. Searsy Green, who observed mother at mother's school and who sang in the choir with mother at Lange's church, testified that mother and M "seemed to be very happy" during this period and that M was well-groomed. Green has "never seen anything that was negative about [M and mother's] relationship." Samantha Heath, who mother also met at Lange's church, testified that the interaction between mother and M "was fine" and that M "was just like every other kid at choir practice." One of mother's community-college instructors, Susan Gayle-Reddoor, testified that when mother brought M to class with her, mother was "very well-prepared * * * to keep her daughter occupied and busy," and that mother and M "seemed very affectionate" with each other. Laurie Barnes, who babysat M in late 2004 or early 2005,

plea had "been on there for a while," even though she claimed that she no longer owed that amount in rent.

[14] Forsberg, who had supervised visits before M was returned to mother's care, testified that she saw M and mother together in the community after M was returned and that M was unkempt and "would kind of wander behind mom when they were walking down the street or in the store. * * * She was just kind of basically trying to keep up with mom."

[15] Lange later told Holmes that, after the police left, mother told Lange that "she has been through this before, don't you think I know what to say. If I tell them I have a support system then they cannot do nothing to me. * * * [Mother] beat the system and was so proud of herself. She let me know it too."

noted that M was well-groomed and always brought a snack and toys with her. She saw nothing concerning about M's interactions with mother or other children. In fact, Barnes testified that M was "very attached" and mother was "firm with [M] but also loving and caring about it." Barbara Sieveking, who provided childcare for M in 2005, also said that M was always clean, well-groomed, and affectionate towards mother, and that mother never mistreated M in Sieveking's presence.

In April 2005, however, mother went to the DHS office where she spoke with Holmes's supervisor, Vickie Rose. Mother told Rose that she "wanted to give her daughter up." Rose was "dumbfounded" because Holmes "had talked about the progress that [mother] had made." When Rose asked mother to explain, mother refused to discuss her decision and "was very determined, very forceful in her demeanor, in her voice, in her eye contact that this was absolutely what she wanted to do." Because Rose was confused, she asked mother to speak to a screener and to provide a written explanation for her decision. Mother wrote that she "d[id] not feel that [she was] capable of raising [M] on [her] own right now" and that she did not wish to discuss the matter further.

After mother left DHS, Rose sent intake workers to Sieveking's home to take M into protective custody. She was placed in shelter care with Stephanie James. When M arrived at James's home, she was "[d]efiant, loud, [and] wilful," and she would "just * * * out of the blue even if she was happy * * * let out this bloodcurdling scream." M was also "afraid to go on the toilet because she had said she frequently got spanked by her mother for pooping in her pants." Despite M's behavioral issues, James found her to be "quite charming" and "quite bright." James attributed M's behaviorial issues to a lack of guidance and loving discipline because, in James's care, M's behavior reformed so drastically that her social worker remarked that he had never seen such a dramatic change in a child.

Once mother relinquished custody of M, she asked Lange to call DHS and ask to be M's foster mother. Although Lange was initially resistant to fostering M, she eventually agreed. Two weeks later, M left James's care and was placed

with Lange. Lange testified that, when M first arrived, "[s]he was in her room isolated[, and] was having—and still does [have]—* * * [v]iolent, scary nightmares." Lange also reported that M had issues about using the toilet (she would "wip[e] herself till she bled down there") and that she discussed how to handle the behavior with Purcell, who had noticed it while M was in her care. While bathing, M "would just scrub * * * so violent[ly]" that she would hurt herself. When Lange tried to teach her not to scrub herself so hard, M would insist that she was not clean.[16] M also exhibited enuresis, aggressive conduct, dissociative behaviors, and inappropriate sexual behavior, including frequently talking about sex in a graphic manner, asking to be touched sexually, and sexually touching others. To address these behaviors, Lange requested that M be referred to counseling, and M began seeing therapist LeeAnne Wichmann in January 2007.

Shortly after M was placed in substitute care, Holmes spoke with mother. Mother was unable to explain why she decided to give up M other than to state that she had made a mistake. When asked for a further explanation, mother blamed others for her problems, including Lange, whom she had referred to DHS as a placement resource. Holmes noted that, despite mother's shortcomings, she "ha[d] increased her reliance on and openness to her support system, which includes many friends from her church," and consistently "expressed her love for her daughter" to him. During their conversation, however, mother never asked Holmes about M's well-being.

In July 2005, the juvenile court held a permanency hearing. The court determined that DHS had made reasonable efforts to reunite M with mother and that it was in M's best interests to relieve DHS from further responsibility to reunite M with mother. The next month, mother's attorney requested a referral to the parenting support agency but was

---

[16] Mother later reported to a psychologist that she has a "dirty issue" and admitted to excessively wiping herself, using up to a roll of toilet paper each day. Caseworker Mary Six, who did not testify at trial, wrote in November 2006 that mother "would wipe [M] so hard, she would bleed so this is what [M has] learned. Foster mom has been working with her on not wiping herself so hard and [M] is concerned she is dirty based on what she was told by her mom."

informed that DHS had been relieved of its obligation to provide services to mother. Holmes also discussed the request with mother, who "indicated that she was not interested in that particular [parenting] class." Holmes then told mother's attorney that DHS had been relieved of its obligation to provide additional services to mother and would not provide the referral. A few months later, DHS decided to seek termination of mother's rights, and the case was eventually transferred to caseworker Jan Phelps.

In September 2005, mother began "spiritual counseling" with counselor Sharon Gayle. Gayle holds a master's degree in marriage and family therapy from Northwest Christian College, and she volunteers as a counselor through her church and with an organization called Christians as Family Advocates. She noted mother's history of physical and sexual abuse, and she diagnosed her with post-traumatic stress disorder. She also noted that mother exhibited dependent and obsessive-compulsive personality features. During their work together, mother "was very eager to do what was right," and Gayle felt that mother was learning how to socialize appropriately and was "getting * * * founded on her feet" through self-esteem building. Over time, Gayle saw mother maturing and characterized her as "in progress" at the time of the termination trial; however, at that time she had not seen mother for several months because of scheduling difficulties, including that mother was "really busy getting things together for the [termination] hearing."

In addition to continuing with counseling until a few months before trial, mother was also continuing to visit M in a supervised setting. Forsberg again supervised visits between mother and M for the first few months that M was in foster care. On one occasion, Forsberg noted that M asked mother not to yell at her and explained to Forsberg that mother was "yell[ing] at her like she did when she was at home with her." Overall, however, Forsberg noted that mother and M played well together during visits and that M was affectionate with mother.

Jennifer Boyet began supervising mother's visits with M in early 2006, and continued to do so for several months. Although mother's attendance was good, Boyet

found several of mother's behaviors troubling, including questions that mother would ask M, demands she put on the child, inappropriate clothing that she wore to a visit, and frightening mood swings. For instance, M once wanted to undress a Barbie doll during a visit, and mother snapped at her in a "frightening tone. * * * [S]he would get to where she was drilling the child or coming down on her, [and] it was frightening to [M]." In fact, M told mother that she was scared, asked to go to the bathroom, and ran away from mother when she returned. According to Boyet, although mother had "a lot of good visits. But when they weren't good, they really were not good. They were frightening. Especially for a child."

From late 2006 until the time of trial, Kristy Manley supervised visits between mother and M. Manley believed that mother more often lectured M than played with her during visits and was "very directive," even though Dubie and others had worked with mother to allow M to play uninterrupted. Manley noted that M was affectionate and seemed happy to see mother. Mother also appropriately reinforced the rules that Manley had set for M, such as cleaning up after visits, and, when M tried to "hump" mother's leg in April 2007, mother stopped the behavior.

Despite the many positive visits, M's Head Start teacher, Sandra Barnes, noticed that M exhibited anxious behaviors and had difficulty socializing with her peers before and after she visited mother. Based on reports from Barnes and Lange that M's anxiety increased around visits, M's reports to her therapist Wichmann that she had "scary feelings" and that monsters came to her house after visits, and Wichmann's observation that M had anxiously pulled out her hair around visitation time, Wichmann recommended that visits be terminated for a few weeks in April 2007, about six weeks before the termination trial. During that period, Lange and M both reported to Wichmann that M had no nightmares and experienced much less anxiety.[17]

---

[17] While M was living with Lange, M's paternal grandmother, who was being considered as a potential permanent placement, had been calling M about once a week. Although the record does not reveal why, she stopped calling M for a period of time around the same time the visits with mother were stopped. Wichmann noted that the decreased contact with her paternal grandmother "could also be helping reduce anxiety."

However, when Wichmann observed visits between M and mother, she noted that their reactions were generally appropriate, with one exception. Mother would touch and tickle M and would not stop until M told her to stop. Mother explained that she deliberately tested M's boundaries around physical contact because "she didn't learn how to use her voice when she was younger and she really wanted to make sure her daughter knew how to say stop or no or to just use her voice." Wichmann noted that such a strategy was ineffective for teaching children about boundaries

"because in [M's] case, if she's already feeling unsafe to some degree with * * * her mother, and her mother continues to physically touch her in a way that * * * [M] doesn't want, [M] shouldn't be the one to set the boundary. Typically parents are the ones who set the boundary and notice and respond to the needs of their children in terms of contact."

Wichmann diagnosed M with post-traumatic stress disorder as a result of the significant and repeated trauma that she had experienced in mother's care, including exposure to mother's wildly fluctuating moods, having been locked away for extended periods without food or access to a bathroom, homelessness, and harsh discipline. Wichmann also noted that M likely has attachment issues, and provided a rule-out diagnosis of reactive attachment disorder, a condition that can severely impair or destroy a child's ability to make healthy attachments. M also exhibited "significant trauma symptoms consistent with a child who has been sexually abused." M's problematic behaviors improved through counseling with Wichmann, and she began disclosing more information about the treatment she received at the hands of her mother. For instance, M told Wichmann that, when M was very young, mother used hot sauce on her tongue to discipline M, which "hurt really bad," and that M was afraid that that would happen again if she were returned to her mother. When Wichmann asked mother about M's disclosure, mother admitted to having used this form of discipline, but explained that she discontinued it after being so advised. M also disclosed to Wichmann that mother disciplined her by hitting her with hangers.

Even more disturbing, a few weeks before the termination trial, M disclosed to Wichmann, while Lange was in the room, that mother and her boyfriend Aaron had "touched [her] private parts." When Wichmann asked M what she meant, she pointed to her genital area and explained, "I was running around, then they told me to sit down and close my eyes and they touched my private parts." Although Wichmann tried to gather more information, M indicated that she did not want to talk about it further. M also told Wichmann during the same session that she considered Aaron and mother "unsafe" adults and that her foster parents were "safe" adults. When Wichman discussed M's sexualized behaviors with mother, she contended to Wichmann that any sexual abuse or exposure to inappropriate material or conduct must have occurred at Lange's home. Wichmann testified at trial that, after observing M with every member of Lange's family, she has no reason to believe that M's alleged sexual abuse occurred while in Lange's care, and, given M's fear of mother, she believes that the abuse occurred while M was in mother's care.

In March 2006, the state filed a petition to terminate mother's parental rights, alleging that mother was unfit by reason of conduct or condition seriously detrimental to M, based on (1) exposure of M to domestic violence, (2) lack of effort to obtain and maintain a suitable or stable living situation, (3) failure to present a viable plan, (4) failure to learn or assume parenting and housekeeping skills, (5) mental, emotional, or psychological abuse of M, (6) an emotional illness or mental illness of such nature and duration as to render mother incapable of providing care for extended periods of time, (7) cruel or abusive conduct toward M, (8) physical and emotional neglect, (9) lack of effort to adjust mother's circumstances, and (10) mother's voluntary absence. ORS 419B.504. The state also alleged that mother failed "to provide care or pay a reasonable portion of substitute physical care and maintenance while custody was lodged with others." ORS 419B.506(1). Trial was set for January 2007.

As the case proceeded to trial, the court ordered mother to submit to a psychological evaluation on the state's motion. Mother was evaluated by psychologist James Ewell

in December 2006. Ewell met with mother once. He conducted a clinical interview, reviewed some collateral information, and administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), the Millon Clinical Multiaxial Inventory-III (MCMI-III), and an abbreviated version of the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). Mother's scores on the WAIS-III were average, indicating no significant intellectual defect. Her scores on the MMPI-2 and the MCMI-III indicated moderate defensiveness when answering the test questions, which Ewell opined may have affected her scores. Ewell concluded that the results could still be clinically useful, however, and noted that the computer-generated interpretation of mother's MCMI-III scores suggested the presence of a histrionic personality disorder with narcissistic and obsessive-compulsive features.

During the interview, mother informed Ewell that she had been codependent with members of her church, specifically Lange. Mother claimed that Lange had encouraged her to relinquish custody of M, and that she did so to please Lange. Ewell noted that mother "expresses a strong motivation and commitment to her child," that she was attending school and working at least part time, that she had housing, and that she was receiving counseling from two individuals. Ewell also believed that M was doing well in foster care and had no behavioral difficulties.

Based on that information, Ewell found "no evidence * * * of any severe pathology such as a personality disorder, severe mood disturbance or psychotic process." He diagnosed mother as having attention-deficit/hyperactivity disorder and post-traumatic stress disorder on Axis I. Although mother exhibited maladaptive, histrionic, obsessive-compulsive, and narcissistic personality features on Axis II, Ewell concluded that those traits did not rise to the level of a personality disorder. Accordingly, Ewell "found evidence to suggest * * * guarded optimism regarding [mother's] ability to parent [M] in the future" because mother appeared to have made progress in counseling over the last 18 months. Ewell opined that continued stabilization might be expected during the next 6 to 12 months and recommended that the termination trial be postponed.

In preparing Ewell to testify at trial, the state noticed that there was "some conflict between evidence that we had concerning this child's status and the information that [a caseworker] had * * * furnished to Dr. Ewell." Ewell received additional information from DHS, including a witness interview with Purcell, a witness interview with Lange, Wichmann's initial assessment of M, and background information from Phelps. After reviewing that information, Ewell wrote a letter recommending that his report be given little weight and that DHS consider having a second psychological evaluation, as well as a psychosexual evaluation, performed by another psychologist.

After receiving Ewell's evaluation, mother moved to postpone the termination trial. The court granted the motion, and trial was set over until March 2007. The state moved for an order requiring mother to submit to a second psychological evaluation by psychologist David Truhn. Mother opposed the motion, arguing that the state was requesting the second evaluation solely to create a strategic trial advantage and not in M's best interests. At a hearing on the motion, the state explained that the caseworker mistakenly gave Ewell incomplete information about M, and, because Ewell's report was subject to impeachment based on that incomplete information, the court had no current valid psychological evaluation of mother. Mother responded that the state controlled the information given to Ewell and could have given him additional information before the January trial date instead of requesting a second evaluation. She also argued that if the proposed evaluation were to proceed as planned, she would receive the report only a few days before trial.

The trial court acknowledged that mother would require extra time to prepare her defense if the second evaluation were ordered, but it concluded that fundamental fairness required that it obtain complete information with which to decide the case given the seriousness of a termination trial. Accordingly, the trial court ordered mother to undergo the evaluation by Truhn, and the trial was set over until June 2007.

Although DHS had not asked Ewell to evaluate any specific aspect of mother's psychological functioning, Truhn

was asked to determine mother's current mental status, her range of intellectual functioning, and whether she presents a risk of harm to M. Truhn met with mother twice before preparing his report. He administered the MMPI-2, the MCMI-III, and several other psychological tests to mother, conducted a clinical interview, a parenting interview, and a mental status examination, and reviewed collateral information. He also noted that he had met with mother in March 2006 for a comprehensive psychological evaluation to determine whether psychological factors were affecting her academic performance and that there was "a significant discrepancy between her self-report in the current examination and the evaluation conducted a year ago."

Mother's test scores showed no significant cognitive deficits, but her scores on the MMPI-2 and the MCMI-III suggested that she was defensive and denying or minimizing her problems. Although Truhn acknowledged at trial that defensiveness is a common response of parents undergoing a psychological evaluation, mother's defensiveness indicated that she did not respond honestly to the child abuse potential inventory. Despite mother's defensiveness, however, Truhn was able to identify several statistically significant findings from mother's results. Just as Ewell's testing had revealed, and similar to Bischof's diagnosis, mother's MCMI-III scores suggested maladaptive, histrionic, and narcissistic personality features. Psychometric testing indicated that mother is gregarious, desires extensive interpersonal contact, seeks attention from others, and may be manipulative and flamboyant in doing so. Truhn also explained that mother "may have feelings of entitlement and have a tendency to exploit others," exhibit mood swings and impulsive behaviors, and experience instability in interpersonal relationships.

During her clinical interview, mother reported that she was not anxious and has nothing to worry about; that she no longer worries about her past abuse because she has chosen not to think about it; that her self-image had "totally changed" so that she has not engaged in impulsive sexual activity, binge eating, or cutting in over a year (although she acknowledged continuing to obsessively wash her genitals); that she is not sexually attracted to children; and that her mood is stable and that she does not experience mood swings.

Truhn found her self-report to be inconsistent with her test results and his own observations, and, given mother's tendency to deny and minimize her problems, he opined that mother's self-report needed to be verified by psychometric test results and collateral information.

Despite trying to portray herself in a positive light, mother made some disturbing statements during her parenting interview. For instance, when queried about her coping strategies, mother indicated that she masturbates any time she feels stressed and was unable to articulate any other method of stress-management. She also told Truhn she might use pornographic movies to educate M about sex when M becomes a teenager. When asked how she would discipline M, mother stated that her only problem with M was "her throwing temper tantrums on the bus," and that she will take practice rides and get off if M starts to act out. To deal with M's enuresis, mother stated that she would deny M liquids after five o'clock in the evening. When asked how she would deal with M's nightmares, she responded, "Pray over her while she's awake. She will need to have a counselor after she comes home just to find out if she's doing okay."

Relying on a combination of his observations, collateral information, and test results, Truhn suggested ruling out chronic post-traumatic stress disorder and obsessive-compulsive disorder with poor insight on Axis I, and he diagnosed a personality disorder NOS with histrionic, narcissistic, and borderline features on Axis II. Truhn opined that the personality traits exhibited by mother during testing and during her previous examination by Truhn "would seemingly [make it difficult for mother to] place[ ] her child's needs above her own on a consistent basis." Mother also "may have difficulty maintaining a stable personality style and mood to be able to offer the child a secure [and] safe setting." Truhn noted that mother "has positive intentions and is motivated to engage in psychotherapeutic activities at times but that consistency is a primary issue for [mother]. She seems to require significant personality development and parenting skills development in an effort to provide her child with a safe, stable environment."

Truhn recommended intensive individual and group psychotherapy to address mother's personality issues and

post-traumatic stress disorder, structured parenting classes regarding the needs and developmental issues of children, and a psychosexual evaluation based on M's allegations of sexual abuse and sexualized behavior. Truhn noted that mother "has made significant behavior and personality changes in the past year," and that, if mother were to consistently follow his recommendations, "a year or more would be a reasonable expectation for her to * * * demonstrate such significant behavioral and personality stability that would be expected for her to be able to provide a safe and stable environment for her child." Truhn concluded that mother's prognosis for parenting M was "guarded to poor" as a result of her "significant interpersonal maturity and the personality issues that are interfering with her ability to maintain a stable lifestyle."

At the termination trial, mother called several witnesses on her behalf, including psychologist David Northway. Northway reviewed Truhn's and Ewell's reports, Ewell's follow-up letter, Joffe's two reports, Wichmann's initial assessment of M, and materials from mother's investigator that included an e-mail from Lange to Holmes, and the state's witness interview of Lange. Northway explained that defensive responses were common from parents undergoing psychological evaluations, questioned the clinical significance of mother's slightly elevated scores during both Ewell's and Truhn's administration of the MMPI-2 and the MCMI-III, and testified that Truhn had erroneously scored mother's MCMI-III on the histrionic scale.[18] He also explained that he never uses the MCMI-III because the standardization sample included only people with known psychiatric difficulties "[so] you can never know how a normal person would look on the MCMI-III. * * * [Instead, y]ou want to use a test that starts with a baseline of this person's normal and let's see what kind of problems they have."[19] Northway also noted that the MCMI-III has "an extremely high error

---

[18] On cross-examination, Northway acknowledged that, even without the scoring error, mother's score on that particular scale was "extremely high." Additionally, as noted above, Ewell reported similar results during his evaluation of mother.

[19] Northway acknowledged during cross-examination, however, that the test would have been more appropriate in mother's case because her history suggests "some clinical problems."

rate for Axis II disorders," and specifically that the test may over-diagnose histrionic and narcissistic personality disorders in people who are outgoing. Northway acknowledged that he is not an expert on the MCMI-III, but he explained that he considers the test poorly designed for the purposes of assessing someone's ability to parent.[20] He also criticized Wichmann's interviewing of M while Lange was in the room, explaining that children are "incredibly suggestible" at M's age and loyal to their care providers.

Northway acknowledged that multiple data sources are necessary to diagnose an individual and that it was conceivably possible but "ill-advised" to diagnose an Axis II disorder, especially a personality disorder that is not otherwise specified, based on patient history alone. He explained that he had not seen or met mother prior to his trial testimony and could not diagnose her. Northway also agreed that if Truhn's diagnosis were accurate, mother would require a year or more of intensive cognitive behavioral therapy to address her psychological issues.

At the time of trial, mother was living in low-income housing subsidized by St. Vincent de Paul. The resident service coordinator, Geneva Van Elsberg, testified that she has known mother for approximately one and one-half years and that she sees mother roughly once a week. Van Elsberg has never received a complaint about mother, and she testified that "[o]ver the last year and a half, [mother has] grown a lot personally," resulting in her having "calmed down" and reacting more appropriately to situations, including taking "a lot more responsibility for what she was doing in the situation besides focusing on what the other person was doing." She also testified that she would continue to support mother as long as mother continued to live there and Van Elsberg continued to work as a resident service coordinator.[21] Cooks similarly testified that mother is "making every effort possible," that mother is "a more mature individual now than she

---

[20] The parties stipulated at the close of evidence that, if recalled by the state, Truhn would testify that the results of his evaluation would be the same if he disregarded the MCMI-III and its results.

[21] Van Elsberg plans to work there at least three more years. At the time of trial, mother was behind on her rent, but she had not yet received an eviction notice.

was before," that mother is more connected to her extended family, and that Cooks and other relatives would offer ongoing support to mother if M were returned to her care. Heath, whom mother knew through Lange's church, also testified that she would continue to support mother if M were returned.

Although mother was no longer in school when the trial was held, she had been working full-time at Albertson's for a week and a half. She explained that she had had other positions while M had been in care, but she testified that she quit each position because it was difficult for her to work and still get to her visits with M on time. Mother also has problems standing for long periods of time because her feet are flat, and each of her prior positions required her to stand. She also explained that her mother has agreed to support her and M for three months if M is returned, after which time she will look for work with a regular schedule. Mother believes she has more job skills now than she did when she relinquished custody of M because she has performed administrative work at Lane County Community College. Vickie Goodness, who worked with mother at the college, testified that she handled the administrative work professionally and reliably, suggesting that she has in fact gained job skills.

Mother also explained that, if M is returned, mother will continue counseling "if my schedule, you know, works out with theirs." In addition to counseling with Gayle, mother has a workbook for codependent women that she has found helpful and has attended at least one Co-Dependents Anonymous meeting. Mother also testified that she attended an 11-week parenting class while M has been in foster care, as well as a family and food nutrition class. She explained that she is "different" than she was when she relinquished custody of M because she had "low self-esteem" at that time, but she has "been working on who [she is and] trying to feel good about [her]self as far as being a black woman."

She contended that she has a more extensive support system in place than she did when she relinquished custody of M, specifically "other people besides the Langes * * * from the church that I didn't have then" and "my cousin that I hang out with, Raulette." Mother also "know[s] [her] family

members a lot more now than I knew then." She expressed a clear desire to parent M until M is an adult, and she feels she will not again be in the same situation she was in when she relinquished custody of M.

Gayle, who last saw mother more than three months before trial, testified that mother is capable of parenting M because she has "a strong faith" and is a "survivor" who is "strong-willed and determined." She would not want M returned to mother's care, however, until she is able to discuss M's allegations of sexual abuse with mother. Although mother has matured while she has been in counseling with Gayle, Gayle described her as "a child in an adult body" because "she's confused as to what is and what is not accepted and appropriate response or behavior[, and p]ersonal relationships and skills are a struggle for her." Mother is "very remorseful that [M] is under state care," but she has not taken responsibility for giving up M, which Gayle thinks must have been a "very scary" experience for the child. Gayle acknowledged that "real" therapeutic progress is not possible unless the patient confronts her own accountability, and that mother has not yet been able to do that.

Although Lange reported that M was doing well in foster care at the time of trial, Wichmann explained that M has special psychological needs that require that she have permanency "to help her start to address * * * in a deeper way some of these behavior issues, some of the emotional issues, and that she can get on with her life developmentally." Wichmann testified that, if M were not going to remain with Lange, she needed a stable, permanent placement "very soon," or she will suffer more deep psychological and emotional wounds and will experience more significant trauma symptoms. It will also further compromise M's ability to make healthy attachments. She also believes that M will continue to disclose information about sexual abuse, as it is "fairly typical in [Wichmann's] professional experience, particularly for younger children" to make delayed disclosures and to "share details little by little." Wichmann opined that M "cannot safely be returned to her mother at this time."

The record does not indicate conclusively what DHS's plan for a permanent placement for M was at the time

of trial. It does reveal, however, that DHS was looking into a relative placement with M's paternal grandmother in Virginia, and that M had had telephone contact with her grandmother. Lange testified that she was willing to be an adoptive resource if M's grandmother declined.

At the close of the evidence, the state withdrew the allegations based on exposure to domestic violence, mother's voluntary absence, and failure to provide care or pay a reasonable portion of substitute physical care and maintenance. The court found the remaining eight allegations of the petition to have been proved by clear and convincing evidence. It also concluded that termination was in M's best interests, and it issued a judgment terminating mother's parental rights to M, from which mother now appeals.

■■ Mother first assigns error to the trial court's order requiring her to participate in a second psychological evaluation. Because the trial court had the discretion to order the psychological evaluation to determine the best interests of M, we review the order for abuse of discretion. *See State ex rel Juv. Dept. v. Maginnis*, 28 Or App 935, 937, 561 P2d 1044 (1977) (court authorized to order parent to undergo a psychological evaluation to determine the best interests of the child in a termination proceeding); *State ex rel Juv. Dept. v. Kopp*, 180 Or App 566, 579-80, 43 P3d 1197 (2002) (citing *Becker v. Pieper*, 176 Or App 635, 641, 32 P3d 912 (2001)) (abuse of discretion standard of review should be employed when the issue on appeal is whether a trial court's decision was within the limits of its legal discretion).

■ Mother contends that the trial court abused its discretion by ordering the evaluation by Truhn because mother had been evaluated by Ewell two months earlier, and that "it is fundamentally unfair to require the parent to submit to one intrusive evaluation after another, for no reason other than to try [to] gain a tactical advantage at trial." The record does not support mother's contention that the state requested a second evaluation only to create a tactical advantage at trial; Ewell himself recommended the second evaluation after learning that he prepared his report based on incomplete information about M's circumstances. We need not determine the state's motivations for requesting the order,

however, because the trial court made its motivation clear: to ensure that all relevant, helpful, and accurate information was available to decide a case that will drastically affect the lives of M and her mother. So that mother had an adequate opportunity to prepare her defense, the trial court set over the trial date when it issued the order, and mother was able to call an expert witness who disputed Truhn's report at trial. Under these circumstances, we find no abuse of discretion.

■ Mother next assigns error to the trial court's decision that her parental rights should be terminated. ORS 419B.504 provides, in part:

> "The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
>
> "(1) Emotional illness, mental illness or mental deficiency of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.
>
> "(2) Conduct toward any child of an abusive, cruel or sexual nature.
>
> "* * * * *
>
> "(4) Physical neglect of the child or ward.
>
> "(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."[22]

---

[22] The state also alleged that mother failed to present a viable plan for the return of M and that mother failed to obtain and maintain a stable and suitable living situation.

The Supreme Court has observed that both parts of the two-part test set forth in ORS 419B.504 must be met before the court orders termination:

> "First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that the 'integration of the child into the home of the parent * * * is improbable within a reasonable time due to conduct or conditions not likely to change.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001) (quoting ORS 419B.504); *see also State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 80-81, 106 P3d 627 (2005) (focus is on detrimental effect of the parent's conduct or condition on the child, not the seriousness of parent's conduct or condition in the abstract). Additionally, the court must find that termination of parental rights is in the best interests of the child. *Smith*, 338 Or at 79.

The state must prove unfitness by clear and convincing evidence. Evidence is clear and convincing if it makes the existence of a fact "highly probable" or if it is of "extraordinary persuasiveness." *State ex rel Dept. of Human Services v. Hinds*, 191 Or App 78, 84, 81 P3d 99 (2003). Furthermore, the state must prove more than unfitness at some point in the past but rather that the conduct or condition is seriously detrimental *at the time of the termination hearing. State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006). If we find clear and convincing evidence that the parent has some combination of conduct and conditions, we consider whether the combination of conduct and conditions is seriously detrimental to that child. *State ex rel Dept. of Human Services v. Rodgers*, 204 Or App 198, 217-18, 129 P3d 243 (2006) (citing *State ex rel SOSCF v. Mellor*, 181 Or App 468, 476, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003)).

With those principles in mind, we turn to the evidence of mother's unfitness. We first address whether mother

suffers from the conditions or has engaged in the conduct that the state identifies as grounds for terminating her parental rights. We then consider whether that combination of conduct and conditions would be seriously detrimental to M if she were returned to mother's care. Lastly, we evaluate whether termination is in M's best interests.

We begin by examining mother's conduct and conditions. The state contends that Truhn's report establishes that mother suffers from a personality disorder, and that, even apart from Truhn's diagnosis, "all of the experts who have evaluated mother agree that she suffers from some sort of mental disorder" that impairs her ability to parent M. In addition, the state points to evidence that mother has engaged in mental, emotional, or psychological abuse of M, cruel or abusive conduct toward M, and has physically and emotionally neglected M. Finally, the state contends that mother failed to obtain or maintain a stable living situation, failed to present a viable plan, and has not attempted to adjust her circumstances or made a lasting adjustment.

Mother responds that she suffers from depression and post-traumatic stress disorder, but she disputes Truhn's diagnosis of a personality disorder. She argues that the evidence that her depression and post-traumatic stress disorder symptoms had lessened and that she had matured at the time of trial demonstrates that her conditions are treatable within a reasonable time so that they do not render her unable to care for M for extended periods. As to the allegations of cruel or abusive conduct, physical or emotional neglect, and physical, emotional, or psychological abuse, mother contends that the record does not contain clear and convincing evidence of such conduct. Although mother agrees that she has struggled to find housing, she points to evidence that, when she did have a place to live, she maintained her home in a minimally adequate fashion, and that she had housing and a job at the time of trial. Mother also plans to seek an office job once she no longer needs to visit M during regular business hours.

We agree with mother that the record lacks clear and convincing evidence that she had failed to maintain and obtain a suitable and stable living situation at the time of

trial. The evidence established that mother has lived in a subsidized apartment for the past one and one-half years. Although there is some evidence that mother's living space has been cluttered and dirty, the balance of the evidence is that mother kept her home in a minimally adequate manner. Despite evidence that mother's housing and employment situations are precarious, the state presented no evidence that her living situation was unsuitable at the time of trial. *See State ex rel Dept. of Human Services v. Squiers*, 203 Or App 774, 796 126 P3d 758 (2006) (state must establish that a parent's living circumstances were unsuitable at the time of the termination hearing).

We agree with the state, however, that mother suffers from a combination of conditions and conduct that render her unfit to parent M. First, mother suffers from a mental or emotional illness of such nature and duration as to render her unable to care for M for extended periods of time. Mother agrees that she suffers from depression and post-traumatic stress disorder, and there is clear and convincing evidence that mother also suffers from a personality disorder. She has been consistently diagnosed with maladaptive personality traits by each expert to render an Axis II diagnosis from the time of her institutionalization up until the time of trial, including Bischof, Gayle, Ewell, and Truhn. Truhn diagnosed a personality disorder NOS. We credit that diagnosis because Truhn was the sole witness to both administer a personality inventory and to testify that his conclusions were reliable. Although defense expert Northway disputed the clinical significance of mother's scores on one of those inventories, Truhn stipulated that he would have rendered the same opinion without relying on those scores. Accordingly, we conclude that mother suffers from depression, post-traumatic stress disorder, and a personality disorder NOS. That combination has rendered her unable to care for M for extended periods of time because it has prevented her from maintaining a stable personality and mood. Truhn explained that, as a consequence, mother experiences "significant turmoil [that has] a tendency to draw attention to her," making it difficult for her to place her child's needs first. As a result, mother's conditions prevent her from being able to "provide the child with reasonable parenting supervision in the near future."

Second, the record contains clear and convincing evidence of cruel conduct towards M, physical and emotional neglect of M, and physical, emotional, and psychological abuse of M. When mother first arrived in Oregon in late 2002, she told Ziemak that she had learned not to hit M from other parents staying at the shelter. Despite that lesson, parenting trainers noted in fall 2003 that mother struggled to manage her anger and frustration when challenged by M or other children. Mother's unsuccessful struggle to manage her anger continued after M was returned to her care in July 2004. Both Purcell and Lange testified, respectively, that mother "tried really hard not to * * * use her hands" to discipline M[23] and that mother asked how she could stop hitting M; they also testified that mother failed at those efforts and that her abusive conduct persisted until she relinquished custody. Purcell, who was deeply involved in mother's life from the time of M's first return until fall 2004, testified that mother "would yell at [M] and she would yank her with her arm [and] just * * * scare [M]." Lange, upon whom mother often relied between fall 2004 and when mother relinquished custody of M, testified that mother "whipped" M "a lot" during that period, that mother denied M food as punishment, and that mother told her she had beaten M after Lange had insisted on feeding the child.

Both women also testified that mother kept M in her room for extended periods of time without access to food or bathroom facilities. M has confirmed Lange's and Purcell's accounts to Wichmann during therapy sessions, as she has disclosed that mother hit her with hangers and that mother locked her in her room and would not "let[ ] me go to the bathroom or * * * eat[ ] food." The evidence of mother's cruel and abusive conduct toward M from the time she arrived in Oregon in 2002, when M was a little over a year old, until mother relinquished custody in June 2005 is clear and convincing.

Third, mother has failed to present a viable plan to address her conditions and past conduct and enable M to be

---

[23] Mother claimed in a letter admitted as a trial exhibit that Purcell instructed her to strike M with a spoon, and that she did not like doing so because it made M cry. Given M's subsequent disclosures to Wichmann that mother whipped her with hangers and Lange's testimony that mother asked her "how she could stop hitting [M]," we find that statement in mother's letter not credible.

returned to her care. She was not candid about how she might react to future situations, and she is unrealistic about future challenges she will face in parenting M. During her psychological evaluation by Truhn, mother was so defensive when answering the child abuse inventory that her scores were considered invalid. Truhn testified that mother "did not seem to have much insight regarding coping strategies if issues would arise." When specifically asked at trial how she would discipline M, mother claimed that her only problem managing M's behavior had been M throwing temper tantrums on the bus, and that she plans to deal with such tantrums by getting off the bus. That statement directly contradicts the testimony of Wichmann, Ziemak, Dubie, Purcell, and Lange. The strategies that mother articulated to Truhn for dealing with M's enuresis, sexualized behavior, and nightmares demonstrate mother's failure to appreciate M's need for ongoing psychological treatment. Her lack of candor about the past and her unrealistic plans for the future demonstrate that she is unable to appreciate the extent to which her conduct has harmed M. She has failed to develop strategies to manage her feelings and avoid such harmful conduct in the future.

Mother is similarly unrealistic about her ability to regulate her moods. The sole stress-management technique that she was able to articulate to Truhn was masturbation. Moreover, Truhn explained that mother's report that her post-traumatic stress disorder and depression symptoms have disappeared is not credible because "[u]sually a chang[e] of significant Axis I or Axis II issues takes extensive psychotherapy [and] medication" "especially for Axis II issues of any type of personality disorder. * * * It takes usually an extremely long time for personality disorders to change. If at all." Truhn also explained that post-traumatic stress disorder symptoms generally do not resolve "through therapeutic completion on their own." Given the inconsistency between mother's self-report and Truhn's psychometric testing and clinical observations, as well as mother's unrealistic expectations about parenting M and managing her own mental health, we conclude that mother has failed to present a viable plan to face the challenges of parenting M in the future.

Fourth, the evidence is clear and convincing that mother's effort to adjust her circumstances, conduct, or conditions is lacking. Mother's assertions to Truhn and at trial that her post-traumatic stress disorder and depression symptoms have disappeared within the last year are unconvincing. Clinical observations and objective psychometric testing supported Truhn's assessment that mother was denying and minimizing her problems. Truhn explained that it was unlikely that mother would stop experiencing symptoms of post-traumatic stress disorder unless "it was being sublimated and then the situation would come up in some other fashion." Truhn characterized mother's report that the problems she has experienced in the past have disappeared in the past year as consistent with her denial and minimization, and he opined that it shows a lack of insight and maturity that renders her prognosis for parenting M poor. Truhn also explained that mother's personality disorder would require extensive psychoeducational and psychotherapeutic treatment, which may take "an extremely long time."[24]

Despite having been counseled by a variety of mental health workers since 2003, at the time of trial, mother had not recognized the severity of her mental health issues, the effect her conduct and conditions have had on M, or the continuing need for her to receive mental health treatment. Although mother has received counseling, she has not confronted her accountability and cannot make "real progress" in therapy without doing so, according to her counselor, Gayle. Mother testified that she would continue counseling "if my schedule, you know, works out with [the counselors]," and at the time of trial she had not seen Gayle for several months because she was too busy "working on the [termination] hearing." Mother's explanation of why she would not have the same problems caring for M in the future was that she has gained self-esteem as a black woman and has stopped being "codependent on other people." It is clear to us that mother persists in believing that M is in care because of Lange and has failed to confront her own contribution to M's

---

[24] We also note that mother told Dubie in 2003 that she did not need a safety plan because she was no longer depressed, yet the record contains clear and convincing evidence of multiple threats of suicide by mother in 2004 and 2005. Her past predictions about her future mental health have not materialized.

circumstances. Mother's noncommittal statements about counseling and her limited understanding of the causes of her past behavior are evidence that she does not appreciate the importance of continued counseling to her ability to parent M. Although there is evidence that mother has made some gains in the past year, the evidence at trial was clear and convincing that those gains have not been and will not be sufficient to render her a minimally adequate parent within a reasonable time.

Having determined that, at the time of trial, mother suffered from mental illness, had engaged in past cruel and abusive conduct toward M, failed to present a viable plan, and lacked effort to adjust her conduct and conditions to enable M to be returned to her care, we turn to whether that combination of conduct and conditions was seriously detrimental to M at the time of the termination hearing. *See Rodgers*, 204 Or App at 218 (citing *Mellor*, 181 Or App at 476) (because child is exposed to all the proven conduct and conditions together, our unfitness determination is similarly based on consideration of that combination and whether it is seriously detrimental to the child). The evidence supporting the trial court's finding that mother's combination of conduct and conditions was seriously detrimental to M at the time of trial is "extraordinarily persuasive[ ]." *Hinds*, 191 Or App at 84. M suffers from post-traumatic stress disorder as a consequence of severe trauma during the early years of life, and may suffer from reactive attachment disorder. Those conditions are directly attributable to mother's conduct, specifically exposing M to unsafe situations, including mother's wildly fluctuating moods and physical abuse. M is so afraid and anxious about seeing mother that, before visits, she has pulled out her hair leaving bald spots. She experiences nightmares, enuresis, and dissociation around visitation time, and these behaviors abate when the visits stop, as demonstrated when visits were stopped for two weeks in April 2007, approximately six weeks before trial.

Although mother ascribes the reduction in anxious behaviors to other factors and claims that M's anxious behaviors started only recently, we note that M exhibited the same pattern of anxiety around visits the first time she was in the state's care. Moreover, M told Wichmann that she is afraid of

mother hurting her, that she considers mother an "unsafe" adult, that "she has scary feelings after visits, and that she, thinks this is why the monsters come to her house." We acknowledge that mother has had several positive visits with M. Wichmann explained, however, that M's positive feelings are only possible because M feels safe in a supervised visitation setting. Given that M herself has attributed her anxiety to seeing mother and that her anxious behavior abated when visits were terminated, we reject mother's assertions that M's troubling behaviors cannot be conclusively attributed to her unfitness.

We are mindful that we must assess whether a parent's conduct or conditions are seriously detrimental to the parent's child at the time of the termination hearing. *See, e.g., Smith*, 338 Or at 83-86 (parent not unfit in absence of evidence establishing a nexus between a parent's mental disorders and the capacity to parent at the time of the hearing); *Simmons*, 342 Or at 96-103 (where mother's drug abuse has been addressed at the time of trial, there was no evidence that her personality disorder was seriously detrimental to the child, and mother and child had positive interactions, trial court erred by terminating mother's rights); *State ex rel Dept. Human Services v. A. M. P.*, 212 Or App 94, 106-07, 157 P3d 283 (2007) (where there is no evidence of the continuing effect of mother's past behavior on her children, the state failed to prove serious detriment to the children); *State ex rel Dept. of Human Services v. Huston*, 203 Or App 640, 646-55, 126 P3d 710 (2006) (where mother acknowledged past wrongdoing and resulting harm to child, treatment providers testified that mother had made progress at the time of trial, and state's experts could not testify as to mother's mental status at the time of trial, mother not unfit).

Here, the evidence establishes a nexus between mother's conduct and conditions and her inability to adequately parent M because her mental conditions render her unable to place M's needs above her own. *Cf. State ex rel Dept. of Human Services v. J. A. C.*, 216 Or App 268, 278, 172 P3d 295 (2007) (inability to recognize child's needs resulting from parent's mental deficiency rendered parent incapable of providing proper care). Despite some gains in self-esteem, mother had not acknowledged or meaningfully addressed the

conduct and conditions that rendered her unfit at the time of the hearing. As Truhn explained, mother's lack of genuine insight into her conditions and her emotional and interpersonal instability renders her presently unable to parent M. Moreover, she will not be able to make therapeutic progress until she acknowledges her past wrongdoing and confronts her own accountability, which she has not done.

We find the evidence extraordinarily persuasive that M continues to suffer from mother's past conduct. *Cf. A. M. P.,* 212 Or App at 106-07. She fears mother and is extremely anxious about seeing her. The evidence is also clear and convincing that mother presents an ongoing risk to M. She has not taken responsibility for her past conduct and is unrealistic about her future ability to parent. Moreover, M has special psychological needs, including the need for ongoing individual and family therapy that incorporates a trauma-focused cognitive behavioral therapy model, that mother has failed to recognize. Based on M's and mother's circumstances at the time of trial, we conclude that mother's unreformed conduct and unaddressed conditions continue to be seriously detrimental to M.

The sole mental health worker to opine that mother is capable of parenting M was her therapist, Gayle. Gayle's explanation as to why that is so is unconvincing: she believes mother's strong faith, strong will, and determination will enable her to parent M. The record establishes, however, that those attributes have not helped her to minimally adequately parent M in the past, and we see no reason to believe that they will enable her to do so going forward. Gayle also explained that she "wanted [mother] to mature. I wanted to help her to be stable. I was hoping that by her coming to me * * * that she would gain some social skills and relationships and be able to be the mother that she would like to be to [M]," but she agreed that mother has not done that, despite some personal growth. Gayle testified that she believes mother has maladaptive dependent and obsessive-compulsive personality traits that do not rise to the level of a personality disorder, yet she does not know whether she is qualified to make an Axis II diagnosis. She administered no psychometric testing, she neither asked for nor reviewed any collateral information from mother's DHS file, and she did not speak to any of the

caseworkers (and testified that she "probably should have"). Moreover, Gayle knows nothing about M or her specific needs. Accordingly, we give little weight to Gayle's opinion regarding whether mother's conduct or conditions would be seriously detrimental to M if M were returned to her care.

■■ We next consider whether it is improbable that M might be integrated into mother's home within a reasonable time due to conduct or conditions not likely to change. Determining a reasonable period for integration must take into account M's "emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20); see Stillman, 333 Or at 146. "That inquiry is child-specific. It calls for testimony in psychological and developmental terms regarding the particular child's requirements." Id. Wichmann testified that M suffers from post-traumatic stress disorder and is at risk for reactive attachment disorder.[25] She further testified that M must have stability and permanency before she can "start to address * * * in a deeper way some of these behavior issues, some of the emotional issues, and that she can get on with her life developmentally." During her initial assessment of M, Wichmann recommended that M receive individual and family therapy that incorporates a trauma-focused cognitive behavior therapy model, and she concluded that relief of M's trauma symptoms will require permanency and "ongoing therapeutic support as [M] moves through key developmental stages and tasks."

Truhn opined that, even if mother had made the changes that she reported to him, given her psychological conditions "it would be necessary for her to demonstrate continued emotional and interpersonal stability as well as environmental stability" and participate in "intensive individual psychotherapy consisting of individual and group therapy to address the personality issues as well as the possible chronic symptoms of post-traumatic stress disorder." If mother were to follow those recommendations, "a year or more would be a

---

[25] Wichmann also testified that she could have also diagnosed M on Axis I with sexual abuse of a child. She noted in her initial assessment (months before M told her that mother and Aaron had "touched her private parts") that M's trauma symptoms were "consistent with a child who has been sexually abused."

reasonable expectation for her to participate and demonstrate such significant behavioral and personality stability that would be expected for her to be able to provide a safe and stable environment for her child." Although he disputed Truhn's diagnostic methodology, Northway agreed that someone suffering from the diagnosis that Truhn gave mother would require at least a year of "intensive therapy."[26] Given mother's testimony that she will continue counseling if it works with her schedule, her lack of insight into her own need for treatment, Gayle's testimony that she failed to make counseling appointments during the three months before trial because she was "busy getting things together for the court hearing," and Truhn's observations that, despite her positive intentions, mother struggles with inconsistent participation in the therapeutic process, we conclude that it will be at least a year, and likely longer, before M can be considered for integration into mother's home. We further conclude that M's diagnosis of post-traumatic stress disorder and her attachment issues, as well as her need for permanency to address that diagnosis and those issues, render a year or more an unreasonable amount of time for this particular child to wait.

 Finally, we consider whether termination of mother's parental rights is in M's best interests. Mother contends that termination is not in M's best interests because DHS plans to place the child with her paternal grandmother in Virginia, "[d]espite the fact that [M] has never met her and despite the fact that [M's] father is a convicted sex offender." However, the record does not reveal where DHS planned to place M, although it does support a finding by clear and convincing evidence that she is adoptable and that Lange will adopt her if she is not placed with her grandmother.

---

[26] We note that M's disclosures of abuse would also have to be further explored before M could be safely returned to mother's care. Wichmann, Ewell, and Truhn each recommended that mother submit to a psychosexual evaluation, and Gayle indicated that the allegations would have to be discussed with mother before she could opine as to whether M should be returned. Although the record lacks clear and convincing evidence of sexual abuse, the exploration of M's allegations could significantly increase the amount of time needed before M could be considered for reintegration into mother's home.

Given M's need for stability and permanency to address the emotional and psychological wounds she has already suffered, her adoptability, and her ongoing fear of mother, we conclude that termination of mother's parental rights is in M's best interests.

Affirmed.